**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DERRY M. STONE, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 13-cv-09316 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| VILLAGE OF BROADVIEW, ) | |
| VILLAGE OF BROADVIEW POLICE ) | |
| DEPARTMENT, JUDY ABRAHAM, ) | |
| DAVIS #90, and CARLSON # 89, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is a motion to dismiss [9] Plaintiff's complaint, filed by Defendants Village of Broadview, Broadview Police Department, Officer Davis #90, and Officer Carlson #89. For the reasons set forth below, Defendants' motion is granted.

**I.   Background[1]**

*Pro se* plaintiff Derry Stone, Jr. ("Stone") alleges, in a six-page, single-spaced narrative, that Defendants violated his constitutional rights. Although his complaint does not specifically delineate counts or lay out precise causes of action, Stone sums up his claims in the complaint's last paragraph, complaining that Village of Broadview Trustee Judy Abraham ("Abraham") "made false reports" against him, "had [him] falsely arrested," and used officers "Davis and Carlson to do her dirty work." He also complains that Abraham and the Village of Broadview

---

[1] The facts are drawn from Plaintiff's complaint. For the purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Police Department have harassed and subjected him to police brutality, and that he "cannot get a fair and unbiased trial in the Broadview court." Consequently, he is "suing Village of Broadview for 2 million dollars, Carlson #89 and Davis #90 for 2 million dollars, Judy Abraham for 2 million dollars, and the Broadview Police Dept. [sic] 4 million."

The Stone family's problems with the Village of Broadview ("the Village") began on April 23, 2012, when – after 14 years without incident – the police came to Stone's house to harass his father, Derry Stone Sr., about an incident that occurred in neighboring Brookfield about which Stone's father knew nothing. When Stone Sr. tried to report the harassment at the police station later that day, "he was arrested on sight due to false allegations." The case against Stone Sr., however, was dropped the following month. Four months later, the police harassed Stone Sr. again, this time for his alleged failure to pay outstanding municipal code violations totaling $1,080 that, according to the complaint, "had nothing to do with . . . [him or] his family." After numerous unsuccessful attempts to contest the balance in the Broadview court system, Stone's father finally was able to compel the Village to correct the error on his credit score by filing suit in the Northern District of Illinois in July 2013. See *Stone v. Village of Broadview*, 13-cv-4823. According to Stone, his father's federal lawsuit also complained about tickets that the Village's building commissioner unfairly had issued to his father on June 3, 2013 due to "high grass and weeds" on the home's lawn – a ticket that Stone now alleges that Abraham (the Village Trustee) ordered the building commissioner to dole out. But more relevant to *this* suit is the altercation between Stone and Abraham that occurred later that day.

According to Stone, he and his friend, Gabrielle Martinez, were walking Stone's dog in their neighborhood around 9pm on the evening of June 3, 2012, when Abraham drove by in a van and cursed at them through her window as she passed. Abraham then – consistent with the

way she had harassed young African American males in his neighborhood for years, Stone alleges – followed the pair in her van, while continuing to shout at them from her car window. Abraham's husband then arrived and tried to provoke Stone to fight him, just as Officer Carlson appeared on the scene in response to Abraham's call to the Broadview Police Department complaining that Stone's dog was unleashed on the couple's walk. Stone says that he explained to Carlson how the altercation began and that he had done nothing wrong, and that, in response, Carlson informed Stone that he regrettably had "to make it look like [Stone] did something because [Abraham] is the village trustee." The Police Incident Report, which Stone attached to his complaint, reflects that Carlson issued Stone a local ordinance ticket for disorderly conduct after detaining Stone in his squad car for a period of time. Stone says that later that week he complained to the Village about Abraham's harassing behavior and filed a Freedom of Information Act request that revealed that, a week after the dog incident, Abraham filed a false report, alleging that Stone had come to her house on both June 4 and 5 to "intimidate her for the prior incident that happened with the dog off the leash."

Village drama then seems to have cooled off for a few weeks until the evening of June 30, 2013, when – as Stone tells it – Officer Davis came to Stone's house around 9pm to harass him. Stone, who was sitting on his front porch with his friends when Officer Davis approached, claims that he politely asked Davis to get off his property, but that Davis instead began "mimicking the way young African American males tend to talk" and spoke to Stone in a derogatory manner. Officer Carlson then showed up in an SUV and, upon exiting the car, announced: "we should just take him in." Stone describes the scene as follows:

> Carlson #89 then pushed me off of the stairs from the top step, as Davis #90 grabbed my right arm and pulled me at the same time. The actions of both officers caused me to fall into the grass of my front lawn. I was laid out face down on the ground. Then Davis #90 wrapped his arm around my neck, not

3

> allowing me to breath [sic]. At the same time, Carlson #89 put his knee in the middle of my back, putting a lot of his weight directly on my spinal cord as he put handcuffs on me. This whole time I had not said a word. Both officers grabbed me, took me to the car, and slammed my head into the car about 2 times.

The Police Incident Report, attached to the complaint, notes that the officers arrived at Stone's home that evening in response to a call from a concerned citizen over Stone's use of alcohol and loud profanity. And, consistent with that report, Stone has attached a police dispatch transcript of the call from that citizen, who complained that Stone and his friends were "on the front of their porch using extremely loud profanity, just swearing, M and F this, M and F that." The caller, apparently a neighbor, informed the dispatcher that "the people next door has [sic] three kids and I know they don't want to call because it will create problems." The Police Incident Report states that Stone was drinking alcohol and using profanity when the officers arrived, and that Stone immediately told them to "get off my fucking property" while walking towards the officers at a fast pace. When Stone refused to comply with Davis's order to back away, the officers attempted to arrest Stone for disorderly conduct, and Stone resisted. The officers subdued Stone and then transported him to the police department, where they issued him local ordinance tickets for disorderly conduct and resisting arrest.

All three of Stone's local ordinance tickets were adjudicated in (presumably municipal) court in the Village of Broadview by Judge Paula Harris, who seems to have presided over a two-day trial that spanned November 25 and December 23, 2013. At trial, Village prosecutor Michael Connelly examined Abraham and officers Davis and Carlson about both the June 3 dog incident and the June 30 porch profanity incident. According to Stone, they all lied, falsely painting him as the instigator on both occasions, and Judge Harris deprived him of a fair trial by giving him "no chance to prove [his] case." Among other things, Stone protests the lack of testimony from the "anonymous caller" who allegedly made the complaint of Stone's drunken

4

and profane behavior on June 30, and Judge Harris's decision to "decode[]" the dispatch tapes relating to both incidents to hide the identity of the callers. Stone's reply brief notes that he "believe[s] that a jury trial will help [him] get a fair trial and prove [his] truth to the fact that the Village Trustee and Officers Carlson #89 and Davis #90 violated [his] rights."

Stone surmises that all of his problems in the Village have "evolved" from Abraham's "ongoing issue with [his] father, into a race issue with [Stone]." Case in point, Stone alleges that when his father refused to support Abraham's mayoral campaign in the last election, Abraham sent the water department to "make a big hole" in their yard to spite them. According to Stone, her disdain for his father has morphed into full-fledged racism towards young African American ("fucking drug dealers," as she allegedly calls them), whom she now harasses all over the Village. At bottom, Stone complains that Abraham "wrongly accused" him, gave "Carlson #89 and Davis #90 the wrong impression" of him, and led "them to emotionally and physically endanger" him.

Defendants (the Village, the Police Department, and officers Carlson and Davis) now move to dismiss Stone's *pro se* complaint. They argue that the complaint violates Federal Rule of Civil Procedure 8's directive to plead a "short and plain statement" of his claims, complaining that it is not practical to answer Stone's allegations in their current format (that is, six pages of single-spaced text without the use of numbered paragraphs). Alternatively, they argue that Stone's complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). But "length alone is generally insufficient to justify rejecting a complaint" and Stone's complaint is not "unintelligible," "vague," or "confusing" – reasons which might justify the dismissal of a *pro se* complaint on Rule 8(a) grounds. See *Stanard v. Nygren*, 658 F.3d 792, 798 (7th Cir. 2011). In fact, Defendants read Stone's complaint as stating three claims against them – (1) false arrest

5

(that is, arrest without probable cause), (2) excessive force, and (3) failure to intervene – and Stone does not oppose (or even comment on) their interpretation in his opposition brief. Because Stone therefore appears to agree with Defendants' characterization of his claims, the Court accepts that articulation for the purposes of their motion to dismiss and rejects Defendants' argument that the complaint is violative of Rule 8(a)(2).[2] Moreover, because the Court agrees with Defendants that Stone has not stated a claim upon which relief can be granted, Defendants' Rule 8 argument is moot.

## II.    Motion to Dismiss Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a

---

[2] The Court notes that Defendant Judy Abraham has not moved to dismiss Stone's complaint. And Abraham's co-Defendants' characterization of the claims against *them* does not (nor does it purport to) bear on the claims that Stone's complaint may state against her. The motion to dismiss at issue here, as well as the Court's ruling on it, therefore, in no way implicates Abraham's status as a defendant in this case or limits (or even speaks to) any future arguments that she may or may not choose to make.

6

'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.")

## III. Analysis

Defendants argue that Stone's claims are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), and that, if the Court disagrees, the actions of officers Carlson and Davis should be entitled to qualified immunity.

### A. *Heck* Bar

In *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), the Supreme Court "held that a district court must dismiss a § 1983 action if a judgment in favor of the plaintiff in that § 1983 action would necessarily imply the invalidity of his criminal conviction or sentence." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). In other words, if a plaintiff "makes allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit." *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003). Put another way, *Heck* bars a plaintiff from advancing a claim that is "incompatible with his conviction." *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008). In considering whether *Heck* requires dismissal, courts "must consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [Plaintiff's] conviction." *Id.*

The Seventh Circuit has explicitly "reserved judgment on whether *Heck* applies to 'an administrative proceeding or a finding of a violation of a city ordinance,'" because the cases in which the issue has arisen before the Court did not include "a carefully maintained record." *Kuhn v. Goodlow*, 678 F.3d 552, 555 (7th Cir. 2012); *Justice v. Town of Cicero*, 577 F.3d 768, 773 (7th Cir. 2009). In both cases, the Seventh Circuit was reluctant to wade into *Heck* territory because the record was vague as to the type of adjudicatory process that accompanied the underlying infractions. But the other Circuits to have considered the issue uniformly have held that *Heck* precludes claims that imply the invalidity of municipal ordinance convictions. See *Daigre v. City of Waveland, Mississippi*, 549 Fed. Appx. 283, 286-88 (5th Cir. 2013) (holding that *Heck* barred plaintiff's excessive force and false arrest claims as incompatible with plaintiff's municipal court convictions for disorderly conduct and resisting arrest); *Swiecicki v. Delgado*, 463 F.3d 489, 492-93 (6th Cir. 2006) (applying the *Heck* bar where plaintiff was convicted of violating a disorderly conduct ordinance); *Zhai v. Cedar Grove Municipality*, 183 Fed. Appx. 253, 255 (3d Cir. 2006) (applying the *Heck* bar to plaintiff's guilty plea for violating a disorderly conduct ordinance); *cf. Bryner v. Utah*, 429 Fed. Appx. 739, 744 (10th Cir. 2011) (determining *Heck* precluded plaintiff's false arrest claim because it necessarily impugned the validity of his disorderly conduct conviction in Utah justice court). Moreover, the Seventh Circuit's concerns in *Kuhn* and *Justice* are not present here.

In *Justice*, for example, the record established that the plaintiff had been cited for violating a gun ordinance, but it was unclear whether "police just issued [the plaintiff] tickets before confiscating the gun, or if he was also later found guilty of violating the ordinance in some quasi-judicial proceeding." 577 F.3d at 773. "Because [the Court] [did] not know the type of conviction or sentence involved, [it] save[d] for another day a more complete consideration of

[the *Heck*] issue." *Id.* Likewise, in *Kuhn*, the plaintiff violated a town ordinance prohibiting disorderly conduct, but "the record . . . [was] unclear as to the type of judicial proceeding in which [the plaintiff] took part." 678 F.3d at 555. In both cases the Seventh Circuit avoided the undeveloped-record issues that plagued the *Heck* analysis by deciding the case on other grounds.

Here, Stone's complaint makes clear that he had a two-day trial in the Village of Broadview court before Judge Paula Harris and that his local ordinance tickets were prosecuted by Village attorney Michael Connelly. Stone complains about the discovery that he received, but his complaint demonstrates that he had opportunity to (and, in fact, did) cross-examine the Village's witnesses. In light of Stone's admission that he had a trial, as well as the Third, Fifth, Sixth and Tenth Circuit's application of *Heck* in the context of disorderly conduct convictions in municipal court, the Court is persuaded that *Heck* applies here. Otherwise, any time a citizen is arrested, tried, and convicted of a municipal ordinance, he could walk straight out of the municipal courthouse and, despite a judge having just disbelieved his version of events and convicting him for the charged offenses, sue the police who arrested him by advancing the exact version of events that the municipal court rejected just minutes earlier and which necessarily are incompatible with that court's findings. For example, a person convicted of disorderly conduct for publicly taunting police officers could, upon losing at his municipal court trial, then sue the officers under Section 1983, alleging that they arrested him without probable cause. If *Heck* did not bar his allegations, this result would contravene the "strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction" on which *Heck* itself was based, (*Heck*, 512 U.S. at 484), and undermine the "finality and consistency"

concerns that the Supreme Court has "long expressed" and that have prompted the Court to "generally decline[] to expand opportunities for collateral attack." *Id.* at 485.[3]

Finally, the Court notes that Stone's opposition brief makes no challenge to Defendants' *Heck* argument. His response merely reiterates the factual allegations set forth in his complaint. Although courts are required to liberally construe a *pro se* litigant's complaint, courts are not required to "construct legal arguments or develop legal theories for the plaintiff in the absence of any discussion by the plaintiff on those issues." *Radivojevic v. Granville Terrace Mut. Ownership Trust*, 2000 WL 1433999, * 2 (N.D. Ill. Sept. 27, 2000). In fact, the Seventh Circuit has held that a plaintiff who "fail[s] to respond responsively to [a] motion to dismiss . . . forfeit[s] [his] right to continue litigating [his] claim." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1043 (7th Cir. 1999); see also *Barnes v. Homestart Mortg. Corp.*, 2012 WL 4434683, at *2 (N.D. Ill. Sept. 20, 2012) (noting that a plaintiff's failure to address the legal arguments in a defendant's motion to dismiss is, within itself, a basis to grant the motion to dismiss). Although the Court will not take such an extreme position in this case, in light of Stone's status as a *pro se* plaintiff, his failure to even address Defendant's *Heck* arguments lends weight to the Court's application of its principles in this case.

Having determined that *Heck* will preclude Stone's claims if his allegations are incompatible with his underlying convictions for disorderly conduct and resisting arrest, the Court must determine whether his claims actually are inconsistent with the validity of the Village court's decision. See *Okoro*, 324 F.3d at 490. First, Stone claims that officers Carlson and Davis charged him with disorderly conduct on June 3 without probable cause. Specifically, he alleges

---

[3] The Court's notes that Judge Tharp recently applied the *Heck* bar on a motion to dismiss where a plaintiff's civil claim necessarily implied the invalidity of an existing traffic ticket for which the plaintiff pleaded guilty and paid the related fine. See *Chriswell v. Village of Oak Lawn*, 2013 WL5903417, *6 (N.D. Ill. Nov. 4, 2013)

10

that Carlson issued him a local ordinance ticket, despite first acknowledging to Stone that he had done nothing wrong and that he only was issuing the ticket "to make it look like [Stone] did something because [Abraham] is the village trustee." This is a quintessential *Heck* problem: what was Stone's defense before the municipal court (that he had not acted disorderly and the police knew it) is now his precise claim in this Section 1983 civil rights suit. Therefore, the allegation *necessarily* impugns the invalidity of that liability determination. The two are incompatible.

The same is true for Stone's claims surrounding the June 30 incident. Stone alleges that officers Davis and Carlson came to his house to harass him and that they arrested him for no justifiable reason. But this claim directly contradicts the finding that Judge Harris necessarily had to make at the conclusion of Stone's two-day trial in Broadview: that Stone was acting in a disorderly fashion on June 30, justifying the officers' decision to arrest him and her own decision to convict him. Judge Harris credited the testimony of the officers and Stone takes issue with that, but that, in essence, is why *Heck* bars his claim – to prevent Stone from advancing his own view of the facts in federal court that contradict those established in an earlier judicial proceeding.

Stone's excessive force and failure to intervene claims are barred by that same rationale. In *Evans v. Poskon*, 603 F.3d 362, 363 (7th Cir. 2010), the Seventh Circuit, interpreting *Heck*, noted that a "plaintiff can only proceed on an excessive force claim to the extent that the facts underlying the claim are not inconsistent with the essential facts supporting the conviction." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). The Court held that the plaintiff "could not maintain a § 1983 action premised on the claim that he did not resist being taken into custody, but could proceed on claims that the police used excessive force in effecting custody or

after doing so." *Id.* Here, Stone attempts to advance a theory that he did not resist arrest. And his claim that the officers lacked probable cause to arrest him evinces his belief that the officers used "excessive" force by virtue of using any force at all. Allegations, like Stone's, that two police officers grabbed an innocent citizen without probable cause, brought him to the ground, and then forcibly placed him into the back of a squad car almost would certainly state a claim for excessive force in violation of the Fourth Amendment. But Stone is precluded from making that claim by virtue of its incompatibility with his convictions for disorderly conduct and resisting arrest. Reading Stone's description of his arrest in that context, the Court reasonably cannot conclude – without more facts – that the officers used *excessive* force in arresting Stone.

The police report, reflecting the description of the incident as told by Officer Davis (whose account was credited by Judge Harris), states that he arrived at Stone's address in response to a call from a concerned citizen reporting Stone's use of alcohol and loud profanities. Upon Davis's arrival, Stone approached Davis in an aggressive manner and told him to "get off my fucking property." Officer Carlson then arrived and the officers attempted to arrest Stone for disorderly conduct. When Stone resisted, a struggle ensued in the front yard, ending only when the officers were able "to take Stone to the ground and take him into custody." They then transported Stone to the Broadview Police Department, where they charged him with disorderly conduct and resisting arrest. Accordingly, Stone is precluded from making his current claims – that the officers used unjustifiable force in effectuating an unlawful arrest – because they necessarily impugn his convictions and contradict the bases on which they rest. See *Heck*, 512 U.S. at 487 n.6 (noting that a Section 1983 claim for unlawful arrest necessarily impugns a plaintiff's conviction for resisting arrest – defined as intentionally preventing a peace officer

from effecting a *lawful* arrest – because, to prevail, he would have to negate an element of the offense of which he had been convicted).

The Court recognizes that "[m]any claims that concern how police conduct searches or arrests are compatible with a conviction." *Evans*, 603 F.3d at 363-64. That is true of both allegations of arrest without probable cause and excessive force, but *only* when those claims do not contradict a plaintiff's underlying convictions. *Id.* at 364. "[A] plaintiff is master of his claim and can, if he insists, stick to a position that forecloses relief." *Id.* That is precisely what Stone has done here. Indeed, Stone's opposition brief concludes by stating his belief "that a jury trial will help [him] get a fair trial and prove [his] truth to the fact the Village Trustee and officers Carlson #89 and Davis #90 violated [his] rights." Stone therefore admits that, through this suit, he seeks to advance his failed defense theory in the underlying proceedings as Section 1983 claims to prove that the officers had no real reason to arrest or charge him for violations of local ordinances for which he was convicted. Because those claims necessarily contradict his convictions, *Heck* precludes them.

For the reasons stated, the Court grants Defendants' motion to dismiss.

### B. Qualified Immunity

Having agreed with Defendants that *Heck* bars Stone's claims, the Court need not turn to Defendants fallback argument that qualified immunity shields them from suit.

## IV. Conclusion

For the reasons stated above, the Court grants Defendants' motion to dismiss [9]. If Plaintiff is in possession of additional factual allegations that he believes may overcome the deficiencies identified by the Court, or if Plaintiff believes that (despite his implicit agreement with Defendant's articulation of his claims) the Court has misinterpreted his *pro se* complaint, he

13

may amend his complaint within 28 days. If Plaintiff does not file an amended complaint by that deadline, the Court will dismiss the case and enter a Rule 58 judgment.[4]

Dated: July 11, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[4] The Court notes that Plaintiff did not properly serve Defendant Judy Abraham. Rule 4 of the Federal Rules of Civil Procedure required Plaintiff to serve a summons, along with a copy of the complaint, on each defendant within 120 days after he filed his complaint with the Court on December 31, 2013. Fed. R. Civ. P. 4(b), (c), (m); *Cardenas v. City of Chicago*, 646 F.3d 1001, 1004 (7th Cir. 2011) ("After commencing a federal suit, a plaintiff must ensure that each defendant receives a summons and a copy of the complaint against it."). Unless a plaintiff obtains a waiver of service from a defendant, service must be effectuated by one of the ways listed in Rule 4(e). Docket entry [13] demonstrates that Plaintiff attempted to serve Abraham by mailing her a summons via the United States Postal Service, which is not proper under the rules. Therefore, because (1) Plaintiff has not properly served Abraham, (2) more than 120 days have elapsed since the filing of Plaintiff's complaint in this case, and (3) Plaintiff has not asked the Court for an extension of time to effectuate proper service, the Court cannot exercise jurisdiction over Abraham, (*Cardenas*, 646 F.3d at 1005 ("[S]ervice requirements provide notice to parties, encourage parties and their counsel to diligently pursue their cases, and trigger a district court's ability to exercise jurisdiction over a defendant.") (internal citations omitted)), and the claims against her are subject to dismissal without prejudice. *Id.* at 1008 (making clear that a dismissal on improper service grounds should be without prejudice). Thus, if Plaintiff fails to file an amended complaint, the case will be dismissed as to Defendant Abraham without prejudice but the case will be dismissed with prejudice as to all other Defendants. The Court notes that although it appears that Plaintiff served all other Defendants in the same defective manner (see docket entry [14]), those Defendants waived any service objection by failing to raise it in their motion to dismiss. *Trustees of Cent. Laborer's Welfare Fund v. Lowery*, 924 F.2d 731, 732 (7th Cir. 1991) ("A party may waive a defense of insufficiency of process by failing to assert it seasonably in a motion or their first responsive pleading.").